The opinion of the court was delivered by
Marr, J.
Silvestre Blasón died at his domicile, in New Orleans, in July, 1876. -A few days after his widow, Emilie Charlotte de Tily, 'Caused to be probated his will, made in 1859, by which she was appointed executrix, with' usufruct for 'life, or duriDg widowhood, of the -entire property of the succession; and her son, Silvestre Blasini, Jr., sole issue of the marriage, was constituted univeral legatee.
By judgment'of the twenty-fourth July, 1876, Widow Blasini was *1389 decreed to be entitled, in absolute ownership, as survivor of the community, to one half the property of the succession, and to the. usufruct.' of the other half; and her son, Silvestre, was recognized as sole heir and owner of the other half, subject to the usufruct of his mother. They were sent into possession, under their respective claims and titles; and? the succession was thus closed.
In September, 1876, this suit was brought by John Blasini, Joseph Blasini, and Loretto Blasini, claiming to bo forced heirs of Silvestre-Blasini, issue of his marriage with Isabella Barera, his first wife, who-died in 18-19. They demanded the nullity of the will, so far as it deprived them of their legitime; and they caused the Widow Blasini and her son Silvestre to be cited as defendants.
Defendants answered by general denial; and they specially denied that plaintiffs were legitimate children of Silvestre Blasini.
On the first trial the demand of the plaintiffs was rejected; but a. new trial was granted; and the district judge, after an exhaustive review of the testimony, concluded in favor of plaintiffs, awarding to them, each, one fourth of the succession. There was again a motion for new trial; whereupon plaintiffs filed a. remittitur, restricting the judgment in their favor to one fourth each, after deducting the-one third which the testator was legally entitled to dispose of to their prej udice. Considering this remittitur, which corrected the manifest error of the judge, the new trial was refused; and the defendants appealed.
In this court appellants have filed a peremptory exception that, as the succession was closed by the judgment of twenty-fourth July, 1876, sending the widow and testamentary heir into possession, no suit: could afterward be brought against the succession. If the- suit had been brought against the widow alone, in her capacity as executrix, it-could not have been maintained; but it was brought against the persons in possession claiming to be owners under the executed will. It was-brought by the proper parties against the proper parties, and in the proper court. A suit by forced heirs for recognition and to annul, in whole or in part, a testamentary disposition, is of probate jurisdiction;: and it fails within the cognizance of the court in which the will has been admitted to probate and has been executed.
There were several bills of exception taken, touching which it suffices to say that the objections went to the effect; and that all the testimony offered and received was pertinent to the only issue in the cause,, the legitimacy of the plaintiffs.
An immense mass of testimony was taken on the trial, which it is-not necessary to discuss separately and in detail. We shall state the material facts, as we consider - them proven, and our views of the law applicable to them.
*1390 Silvestre Blasini, a Corsican by birth, in early life a sailor, came to New Orleans in 1833, or 1834, when he was about twenty-five years of age. He pursued different avocations; and made one or more voyages to Mexico and the islands of the Gulf; but he finally established himself permanently in business as the keeper of an oyster saloon and coffee-house.
About 1835 he was living with a very young woman, a Mexican, of dark complexion, whom he introduced to his friends and acquaintances as his wife, whom he said he had married in Mexico, whose name was Isabella Barera; and he continued to live with her publicly, introducing her as his wife, calling her his wife, until she died.
There were six children, issue of this connection, the first born in 1836, the last in 1848. Three of them died, before their mother, and the survivors are the plaintiffs in this suit.
These children were reared in the house of their father and mother;- and they were treated, cared for, and educated in "all respects as their1 legitimate offspring. They were sent to schools of the highest respectability; they associated and played with children of their own age, of respectable parentage, living in the same vicinity, without any question as to their legitimacy; and the father caused a marble slab, with inscriptions, to be placed over the vault in which were buried two daughters, one born in 1836 the other in 1838, of whom the latter died in March, 1849, about two months before their mother. It will hereafter appear why the inscriptions on this slab were not produced in evidence.
On one occasion Blasini gave a dinner at his own house, on the anniversary of his marriage ; and when he and the guests, probably, had drank too freely, he resented some supposed or real indignity to his wife by a violent blow, for which he was arrested.
On another occasion, when one of the witnesses, a woman, asked him where he got that “pretty little Mexican,” as the phonographer reports it, or “ mulattress,” as one of the counsel, or “maitresse,” as the other counsel understood the witness, Blasini answered promptly: “You are mistaken; that is my wife.” “What church were you married in?” “ In Mexico,” he said. She immediately apologized ; and he said it was all right; but that she was his wife. This witness went to Blasini, as she says, merely to gossip. It is evident that the dark complexion of Isabella had-impressed the witness with the idea that she was colored, and, therefore, could not be the wife of Blasini; and licensed her, as she supposed, to speak thus slightly of her. The “ pretty little Mexican,” with whom the witness was not then acquainted, was in sight, but not within hearing. Blasini afterward introduced her to witness as his wife; and when witness told her, as a joke, what had passed between herself and Blasini, she told witness she was married.
*1391 On one occasion when one of the friends of Blasini censured him, ■out of the presence of Isabella, for his ill-conduct to his wife, he says Blasini told him she was not his wife.
On another occasion, a colored woman, who is rich enough to live off the earnings of the past, who did not hesitate to say that she was a ■concubine, and had been living in that condition for thirty-five years, testifies that she went to Blasini’s, as she was in the habit of doing, to buy fish or oysters. She says she found Isabella in a corner of the room, crying, as she told witness, because of the ill-treatment of Blasini. Witness asked why she allowed him to treat her in that way; and she said, “ because he has got the upper hfind of me. I am not married to him, and that is the reason he treats me so.” She thinks this was about 1848; and she says, on cross-examination: “I did not talk to her before that, or after that, about any thing.”
On another occasion, as one of the female witnesses says, Blasini visited witness and hex husband, at their home, and introduced witness and her husband to Isabella as his wife. She and Isabella immediately entered into conversation, sitting on a sofa, apart from the men; and she heard Blasini say to her husband, he was living with Isabella and having children by her, but that he was not married to her. Why not? Because it is a delicate thing; but she is colored, and I can’t marry her. Subsequently, Blasini came and told her husband Isabella was sick; and her husband, at the request of Blasini, sent her to see Isabella. Witness found her in bed, and in tears. In answer to. her inquiry as to what was the matter, Isabella said: “ I am grieved to think I am not married with Mr. Silvestre.” Witness went no more, and never saw Isabella again, because it was not an honest house!
The whole story is very improbable. The first time witness saw Isabella was when she and Blasini made a friendly visit, and Blasini, presenting Isabella to herself and her husband, said : “ I introduce you my wife;” and soon after she heard him telling her husband he was not married to her because she was colored, which, if it had been true, would have made their marriage legally impossible, and the visit an insult. After that, neither witness nor her husband had any thing to learn as to the social relations of Blasini and Isabella. The second and last time she saw Isabella was when her husband sent her, at the request of Blasini, to visit, according to her, his colored concubine, whom she found in bed, sick with grief because she was not married to the man with whom she was living, who made friendly visits with her, who introduced her as his wife; and by whom She had three children living. Her husband did not want her to visit Isabella again, because it was not an honest house, which, if it had been the fact, she and her husband knew just as well from the beginning of their acquaintance with Isabella as they could *1392 have known it afterward. The statement which she says Isabella made to her was precisely what her womanly, motherly instincts would have prompted her to keep as a sacred secret. Certainly she would not have been so ready to reveal to a stranger a fact which caused her so much distress and suffering, which would have made her an avowed concubine, and would have marked her children visibly with the ineffaceable stain of bastardy. This witness is the only one who pretends that Blasini ever said that Isabella was a colored woman ; and the evidence proves-conclusively that she was of Spanish origin, speaking Spanish as her mother tongue.
The story of the old colored concubine is equally improbable. She represents Isabella, with whom she never talked about any thing before 'or after that time, as unnecessarily and extraordinarily communicative ; 'and she makes her assign as a reason for submitting to Blasini’s ill-treatment, and for continuing to live with him, what would have been the very best reason for leaving him ; and would have enabled her to break off at any time a burdensome connection, which marriage alone would have made obligatory and permanent.
No greater importance is due to the statement said to have been made by Blasini to his friend who censured him for his conduct to his Wife. Under the influence of passion, or to excuse himself, or to escape further censure, Blasini might have said he was not married ; but such a statement could not be permitted to belie the entire history of his public cohabitation.
On other occasions, as early as 1836, at different times, under different circumstances, to his best and most intimate friends, Blasini introduced Isabella as his wife ; and he told them he had married her in Mexico. She bore-his name, was called M’me Silvestre and M’me Blasini; and in conversation with others he called her his good wife, his angel. When she died he said to his best friend, Bofill, now dead, who superintended the funeral arrangements : “ Tu iras enrégistrer la mort de ma femme.” This was said in the hearing of a witness who gives his exact words, and who saw Bofill leave to do this service. In the proper book, in the office of the Recorder of Births and Deaths, under date June 10, 1849, upon the declaration of Bofill to the Recorder, in the presence of two subscribing witnesses, her death was registered as having occurred on that day ; and it is also stated that she was a native of Mexico, aged twenty-eight years, and that she was married to Silvestre Blasini, “ her surviving consort.” The use of the pronoun "tu” by Blasini in his instructions to Bofill proves the intimacy of their relations, which is otherwise abundantly established ; and he must have learned from Blasini the particulars embodied in the mortuary registry.
On the twenty-second September, 1849, about three months after the *1393 ■death of Isabella, Blasini married Emilie Charlotte de Tily. When asked why he had married again, he said he wanted somebody to take care of his children. They were the three plaintiffs in this suit, the eldest ten, •the next four years of age, the youngest about eighteen months old. These children were presented to the newly-married wife by her husband, their father, as his children. They continued to be members of his household; and they were cared for and treated with uniform kindness by their stepmother, as one of them acknowledges and testifies. When Silvestre, Jr., sole issue of this marriage, was baptized, John, the •oldest son of the first bed, was his godfather; and it may be added, though out of the chronological order, that when Charles Louis, son of •John Blasini, was baptized, in October, 1873, Silvestre, Jr., was his godfather.
^ Erom the records of the church copies wore produced, showing that .John was baptized on the fifteenth July, 1839, as the son of Silvestre Blasini and Elizabeth Barera; and that Joseph Marie was baptized on the thirtieth June, 1842. This record is remarkable, because it must be presumed that the officiating priest learns from the father and the mother the particulars which he embodies in the registry of baptism:
“Le 30 Juin, 1842, a étó baptise Joseph Marie Blasini, nó le quatre Juin, 1842, enfant legitime de Sylvestre Blasini et Da. Isabella Barera, «on épouse.”
Why did the priest, writing in the French language, prefix to the name of the mother the title appropriate to a Spanish or Italian wife ? How dared he style the child presented for baptism “ enfant legitime,” upon any other hypothesis than that he received from the parents, at the time he performed the ceremony, the particulars of which he made permanent record ?
Equally remarkable is the registry of the death of Rosa, in which ■•she is described as the legitimate daughter of Mr. Sylvestre Blasini and of Mrs. Blasini. True, this registry was made upon the declaration of Déjoux, a near neighbor of Blasini; but it is not to be presumed that he would officiously, without the request, or at least the.knowledge and •consent of the parents, have taken the trouble and incurred the expense ■of having this registry made, which could by no possibility have benefited him.
If these records serve no other purpose, they show beyond controversy that the parents of these children were publicly reputed to be husband and wife; that they publicly assumed to be husband and wife in the most solemn acts of social life ; and that, with their knowledge and consent, their offspring were publicly reputed to be their legitimate children.
There were two daughters, Felicite Carmen, or Carmelite, as the *1394 witnesses call her, and Apolina Rose, or Rosa, as she was called, the first, born in 1836, the last in 1838. There is no proof fixing the period of the death of Carmélite; but the proof is abundant that Rosa died but a. short time before her mother, in the same year. They were both buried in the same vault, belonging to their father, in which he was afterward buried. Several years after the death of Rosa, the testimony is some, time before the war, Blasini employed a marble-cutter to place a slab on the vault, with inscriptions prepared according to his instructions. Within a short time, probably less than a month after the death of Bla■sini, the same cutter called on Widow Blasini to contract for putting a new slab on the vault. The widow, Silvestre, Jr., and his wife were-present at this interview, and there was some conversation as to what, should be done with the old slab, commemorative of the two girls. The cutter suggested that it might be broken, and used about the new work. It was finally agreed -that this should be dene; and now nothing remains to show what these inscriptions were, which testified to-the father’s love for the first fruits of his cohabitation with their mother.
A memorandum-book, which seems to have been used by Blasini, for' his private affairs, was introduced in evidence, and comes up in original. The earliest date seems to be 1863 ; and the entries are not in chronological order. It is written for the most part in Italian, though there are entries in English and in French-by different hands. Some of the writing was done by Silvestre, Jr.;' and all that is in Italian does not seem to be by the same hand, though the greater part is. Most of the writing relates to business matters. One on the last leaf, purporting to be by Blasini, dated fourth March, 1863, states that Loretto, whom the writer calls “ II mio raggazzo,” my boy, commenced work on that day for Bernard. About thirty pages from the end, after an entry of July 11, 1868, is a memorandum that “II mio figlio Silvestre” had engaged to work by the month, beginning on the second November, 1873. On the reverse of the front back of the book is a memorandum that “II mio figlio Loret” arrived from Brazil on the sixth January, 1873; and at the'foot of the same page it is related that Joseph commenced work by the month, beginning on the seventh October, 1868. About forty pages from the beginning, immediately following an entry of June 2, 1868, is a memorandum that John arrived from New York, with his wife, on the fifteenth August, 1873, and that they left for Galveston on the twenty-eighth of the same month. The proof shows that they spent the intervening fortnight at the house of Blasini, where they were received and treated as members of the family. About a dozen pages further on, following entries of October and November, 1869, on the same page, it is stated that Loretto left for New York, by steamer, on the seventeenth May, 1873.
*1395 Insignificant as these entries might otherwise be, they afford important and unmistakable evidence of the affectionate fatherly interest which Blasini continued to take in these his children, and of his continued, avowed recognition of them as his sons, for more than twenty years after the death of their mother.
After.an entry of August, 1869, near the middle of the book, are several blank pages, followed by a business memorandum of fifth January, 1867, or 1869, the last figure is not distinct. Then follows, on three consecutive pages, a statement, in Italian, said to be in the handwriting of Blasini, which purports to be the pedigree of all his children, beginning with the first, a daughter born in 1836, and ending with Silvestre, born in 1852. The writing immediately following this is dated second September, 1869. It is in different ink; and it affords no clue to the date of the pedigree. The uniformity of the writing indicates that it was all done at one sitting; and the freshness and color of the ink show that it is of recent date.
This statement is divided into as many paragraphs as there were children. Each separate paragraph relates to one child; and each purports to be signed by Silvestre Blasini, except the third and fifth. The statement is minute. It gives the day of the month and the year of the birth, the name of the mother, the name of the child, the name of Silvestre Blasini as the father, his birthplace, the names of his father and mother, the nativity of the mother described to be “ del isola di Mesicho;” and the names of the godfathers and godmothers of all except Rose, stated to have died the day after her birth, and Silvestre. It mentions the date of the baptism of one, and the church at which another one was baptized. It applies the words “ figlia di me Silvestre Blasini i di Isabell Barera” to the daughter Rose; and the words “figlio di me Silvestre Blasini i sua matre Isabell Barera” to each one of her sons; and it adds the surname Blasini to the baptismal names of two of them.
The statement with respect to Silvestre is equally minute, except that no mention is made of his baptism. Perhaps the omission was accidental; perhaps the writer did not care to say that John Blasini was the godfather. It uses the words legitimate three times: once with respect to the mother, styled “mia sposa legitima”: once with respect to the son, styled “ figlio legitimo di me;” and once with respect to the father, “ patre legitimo del mio figlio.”
It is manifest that this writing was not contemporaneous with the events to which it relates; and that the writer’s memory was at fault in several particulars. Rose, the second child, is' stated to have died on the twenty-fourth July, 1838. Independently of the official registry of her death, the proof is ample that she died in 1819. The date of the baptism of John is stated to be the eighth of July, 1839: whereas, the *1396 records of the church show that he was baptized on the fifteenth July.
There were two boys, named Joseph, or Gioseppe, one Gioseppe Maria, born fourth June, 1812, died fourth July, 1812. After minute details of his birth, parentage, and death, the words “ figlio naturalle” have been written between the date of the death and the signature, on the same line. These words seem to have been an afterthought. They evidently occurred to the mind of the writer after the paragraph was completed, apparently after the signature was written. If they had expressed the truth, their proper place would have been in the body of the paragraph, where the words “ figlio di me” are written. This same Joseph Maria is styled in the registry of baptism, in the archives of the church, “ enfant legitime de Sylvestre Blasini et de Da. Isabella Barera, son epouse.” This registry is contemporaneous history; and it can not be destroyed by the application to this child, more than twenty years after his death, of the words “ ñglio naturalle.” It is strange that the writer selected this dead child of the six children of the same bed, and applied these words to him alone. It is equally remarkable that these words should have been falsified in advance by the registry of his baptism, on the thirtieth June, 1812, five days before his death.
With respect to Loretto, the last.child of the first bed, born in 1818, the writer could not recall the date of his birth: so, at the head of the paragraph relating to him he gives the date “ alii 13, o 18, o 20 del Mese di Genaro.” That is, when he was writing this paragraph he did not know whether this child was born on the thirteenth, or the eighteenth, or the twentieth of the month. Was it the father of the child who was thus forgetful? Would the father have set down deliberately, with the honest intention of writing a true and faithful pedigree of his children, without first having assured himself of all the particulars, and refreshing his memory when he found it defective ?
The evidence shows that John Blasini was a wild boy; and as he approached manhood he gave his father great trouble, caused him much expense, and incurred his serious displeasure. About this time, influenced by his partiality for Silvestre, and to some extent by his feelings toward John and his brothers, all of whom he characterized as had boys, according to the witnesses, Blasini determined to dispose of his entire property to their exclusion. Accordingly, in 1859, he made his last and only will, in which there is no reference to a former marriage, nor to any offspring except Silvestre, whom he describes, not as his only child, but as the only child of his marriage with Emilie Charlotte de Tily. The language of the will is: “Je suis marie h dame Emilie Charlotte de Tily, et n’ai qu’un enfant de mon dit mariage, nomine Sylvestre Blasini.”
He did not, at any time, inform the children of Isabella that there *1397 was any question of their legitimacy; but he did tell Dr. Lemonnier, and other respectable persons, after the birth of Silvestre, that he had not married Isabella, and that his children by her were illegitimate. He knew that his will could not be maintained if his children by her were held to be legitimate; and his disparaging and unnatural statements, perhaps the use of the words “ figlio naturalle” in his memorandum-book, with respect to the dead child, and the superabundant use of the word legitimate in the pedigree of Silvestre, may be attributable to the settled determination to have the will maintained for the benefit of Silvestre, on whom his father relied, as he told one of the witnesses, to support the honor of his name and family.
By our law, marriage is a civil contract. The most important of all contracts, it is meet, it is decent, that it should be celebrated with such publicity and with such solemnities as would leave no defect of proof that the parties were able to contract, that they were willing to contract, that they actually did contract. The presence of the civil magistrate or the minister of religion, and of kindred and friends, is eminently proper; and the license gives assurance of the absence of all legal obstacles. But the law does not require written evidence of the marriage, nor the testimony of those who were present and witnessed the ceremony; nor does it avoid the contract for want of a license.
In many cases it would be a cruelty to require positive proof of actual marriage. Especially would this be unreasonable and oppressive where, as in this case, the reputed marriage is said to have taken place in a foreign land: where both the parties are dead; and where their offspring, about whose actual filiation and descent there never was the vestige of a doubt, do not know in what part of that foreign land the marriage may have been solemnized.
The law will not tolerate the presumption that a man and a woman who live together, publicly, as husband and wife, are really living in concubinage in violation of the law and of public decency. From certain established facts certain legal presumptions are deduced; and where it is proven, as in this case, that the parties from the time of their first appearing together in the community in which they made their permanent domicile, publicly cohabited, assuming to be husband and wife, without separation or interruption until death intervened: that the woman bore the man’s name, and he called her his wife, and introduced her as his wife, and declared that he had married her in the land < f her birth: where they present their offspring to the world as their children, give them the surname of the father, have them baptized as their children, and rear, and care for, and educate them as such, the law accords to the man and the woman and to their children a legal and social status, based upon the presumption of marriage, the consequence of which is *1398 the presumption of legitimate filiation and descent, which imposes on those who assert the contrary the burden of destroying that presumption. It is not going too far to say that the entire conduct of Blasini and Isabella created, in favor of their children, a presumption of legitimate descent, which could be destroyed only by proof that they were not actually married, or that there was some legal impediment by reason of which their marriage was legally impossible.
This presumption does not sanction voluntary cohabitation, nor elevate concubinage, of whatever duration, to the dignity of marriage. When it is said that marriage may be proven by reputation, the meaning is that the acts and conduct of the parties, as established by satisfactory proof, authorize and create the presumption that they were actually married, with all the formalities required to constitute a valid marriage by the law of the place at which it is reputed to have been solemnized : and this presumption is such that it yields only to proof that there was no such marriage, or that it was void because of some nullity established by law.
If a man or woman so circumstanced, to gratify some whim or caprice, or to accomplish some settled purpose, should deny the reputed marriage, a moral estoppel would intervene, and forbid the falsifying of their acts and conduct by such denial.
During the entire cohabitation of Blasini and Isabella they were apparently living in the observance of the obligations of the contract of marriage; and their acts and conduct are not compatible with any other theory than that they were actually married, in Mexico, before Isabella came to New Orleans. We must, therefore, regard the plaintiffs as their legitimate children, and forced heirs of their father, Silvestre Blasini. As suph, they are entitled to participate equally with their paternal brother, Silvestre Blasini, Jr., in that portion of the succession of their father, the two thirds, which he was forbidden by law to dispose of by will to their prejudice. .
That part of the judgment of the district court which awarded to Widow Blasini the one half is not before us for review. Upon the hypothesis that it is correct, the other half constitutes the succession of Silvestre Blasini. Whatever the succession of Silvestre Blasini may be, Silvestre Blasini, Jr., is entitled to one third of it, under and subject to the conditions of the will. The remaining two thirds will be divided equally between the three plaintiffs and Silvestre, giving to each one fourth of these two thirds. This is the extent and' effect of the judgment of the district court, as restricted by the remittitur and the judgment refusing a new trial, and no amendment is necessary.
The judgment appealed from is therefore affirmed with costs.
Rehearing refused.